STEPHEN YAGMAN (SBN 69737)
filing@yagmanlaw.net
(for filings only)
JOSEPH REICHMANN (SBN 29324)
YAGMAN + REICHMANN, LLP
333 Washington Boulevard
Venice Beach, California 90292-5152
(310)452-3200

Presented on behalf of Plaintiff and
Class Representative D. JACOBS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| PEOPLE OF CITY OF LOS ANGELES WHO ARE UN-HOUSED, AS A CLASS REPRESENTED BY D. JACOBS, as representative of a class of unhoused persons who reside and resided in the streets and on the sidewalks of the City of Los Angeles,<br><br>Plaintiff,<br><br>v.<br><br>ERIC MICHAEL GARCETTI, *et al.*,<br><br>Defendants. | 2:22-cv-08010-DOC(KESx)<br><br>**PLAINTIFF'S RESPONSE TO MAG. JUDGE'S REPORT AND RECOMMENDATION, REQUESTING THAT IT BE ACCEPTED, IN PART, AND REJECTED, IN PART, AND THAT CLASS CERTIFICATION BE GRANTED**<br><br>Judge David O. Carter |

Plaintiff objects to the parts of the R&R in which the Mag. Judge recommends that both the class representative and class counsel not be selected for those positions, and requests that the R&R be accepted in all other respects and rejected in those two respects, and that the same finding as made in the *Finley* case as to class representative and class counsel be made in this action.

1

Plaintiff and counsel question to what extent, if any, defense counsel should be permitted to challenge the class representative and class counsel, thereby getting to chose their opponents.

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff objects, in part, to the Mag. Judge's Report and Recommendation.

## I. INTRODUCTION.

Plaintiff requests that all parts of the Mag. Judge's Sept. 4, 2024 Report and Recommendation ("R&R"), Doc. 92, save and except for the parts entitled "Proposed Representative," pp. 11-2, and "Proposed Class Counsel," pp. 12-13, and the Recommendation that "Plaintiff failed to carry his burden to satisfy Rule 23(a)(4) (adequacy of the proposed representative party) [and that t]he Court further finds that proposed class counsel does not meet the standard for appointment under Rule 23(a)(4) or Rule 23(g)[,]" *ibid.*, be accepted and that the rejection of class counsel be rejected, in full accord with this Court's class certification order in *People of City of Los Angeles Who Are Unhoused [Finley] v. Garcetti*, 2:21-cv-06003-DOC(KESx), 2024 WL3822325 (C.D. Cal. 07/31/24), a copy of which is attached hereto, a companion case to the instant case, that was low-numbered to this action pursuant to this Court's related case rule, and in which the only material difference between the two actions is that the City of Los Angeles Municipal Ordinance that is in issue is § 41.18 in that action and §§ 56.11 and 56.12 in the instant action.

Importantly, in *Finley*, on the issue of the adequacy of class counsel, which the same defense counsel as in the instant action did *not oppose*, this Court found that defendants had "conceded" this issue, 2024 WL3822325 at *5,but did not rely on this concession, and then went the further step of stating that:

> In its own analysis, moreover, the Court agrees that Plaintiffs' named representatives and counsel would be fair and adequate representatives.

None of the named plaintiffs or proposed class counsel appear to have any
conflict of interest. The Court also finds that Plaintiffs' counsel will
vigorously prosecute this case. The Court therefore finds that the adequacy
requirement of Rule 23(a)(4) is satisfied as to Plaintiffs' proposed
representatives and counsel.

. . .

Defendants do not oppose the appointment of Plaintiffs' counsel as class
counsel, *see generally* Opp'n, and as such have conceded that Plaintiffs'
counsel is adequate under Rule 23(g), *see, e.g., Day*, 191 F. Supp. 2d at 159.
The Court agrees that Plaintiffs' counsel is qualified to serve as class
counsel under Rule 23(g), as Yagman and Reichmann LLP has
demonstrated the ability, resources, and motivation to vigorously pursue the
current case on behalf of the Class.

**IV. Disposition**
For the reasons set forth above, the Court GRANTS IN PART Plaintiffs'
Motion to Certify Class. The Court CERTIFIES the Class to pursue class
claims under Rule 23(b)(2), APPOINTS Plaintiffs Jacobs and Serin as Class
Representatives for the Proposed Class, and APPOINTS Yagman and
Reichmann LLP as Class Counsel for the Proposed Class.

*Id.* at *5 & *7. Of some small importance is that the law firm Yagman +

Reichmann, LLP was appointed as class counsel, and did not appoint only Stephen

Yagman. *See infra*. Defendants and defense counsel, who are the same in both

actions, did not file any objection to the Judge's order in *Finley*.

Now, in effect, the *Finley* class certification order should be the equivalent

of the law of the case in the instant action, and, also in effect, the Mag. Judge and

defendants ask that the Judge not follow it and overrule it. Both because it is

sound and because there is no legitimate reason to overrule it, the Mag. Judge

R&R should be accepted as to all parts except the denial of appointment of class

counsel and rejected as to the denial of class counsel.

**II. DISCUSSION: ERRORS IN THE MAG. JUDGE R&R.**

There are numerous errors in the R&R each and all of which warrant that it

not be accepted as to its recommendations that (1) Plaintiff David Jacobs is not an

3

adequate plaintiff/class representative or (2) Yagman + Reichmann, LLP not be appointed as class counsel. The Mag. Judge's comments are discussed seriatim, in the order in which she discusses them.

### Adequacy of Plaintiff as Class Representative

Plaintiff David Jacobs is an adequate class representative, because he fairly and adequately can protect the interests of the class, and he did not need to present any declaration (and his counsel does not know of any authority that requires him to do so, nor is any such authority cited in the R&R[1]) attesting to his "willingness" to represent the class, his ability to do that, and his means for receiving notices and communicating with class counsel, *etc*. It is sufficient that experienced class counsel assessed his adequacy to represent the class and vouched for that fact.[2]

Neither Mr. Jacobs nor his counsel believed that he needed to submit any declaration, beyond his being listed as a plaintiff.

### Adequacy of Class Counsel

1. The *Finley* defendants in case 6003 did not contest the adequacy of the same class counsel in that parallel case, but now object. The failure to object in that case here should be binding, both on a quasi-law of the case basis and similarly to on a collateral estoppel basis, because the same defendants and their same counsel all had an opportunity to fully and fairly litigate this issue in *Finley* and failed to do so.

---

[1] Indeed, it is doubtful that any unhoused person could fulfill whatever the adequacy criteria might be.

[2] The case cited in the R&R, *Plumlee v. Pfizer, Inc.*, at p. 11, which lists class representative generic duties, and which a parenthetical describes as authorizing discovery to investigate a proposed class representative's mental health "after a doubt was raised," is wholly inapposite here.

2. Stephen Yagman's 17-year-old, 2007 convictions, based on conduct that occurred nearly 25 years ago, in 1999, in fairness to both him and his clients, virtually all of whom he represents *pro bono publico*, should not bar him from acting as part of the class counsel team of Yagman + Reichmann, LLP, which team was appointed as class counsel in 6003.

3. Mr. Yagman's ineligibility to practice before the Ninth Circuit is wholly irrelevant, for at least two reasons.

First, this case is in this court and is not before the Ninth Circuit. (Mr. Yagman remains admitted to practice before the U.S. Supreme Court: query: should an attorney who is not a member of the Supreme Court bar be barred from appointment as class counsel in a U.S. District Court?) Second, both Judge Reichmann (a lawyer of 65 years) and Marion R. Yagman (a lawyer of 46 years) are admitted to practice before the Ninth Circuit, and have practiced extensively, before the Ninth Circuit. This never, ever has prejudiced Mr. Yagman's unhoused clients before, or ever, and the Mag. Judge's finding in this regard is both baseless and erroneous. In the *Finley* case, Judge Reichmann, who has been counsel of record in this action since the day it was filed, on Nov. 2, 2022, and who was counsel of record in the Ninth Circuit, fully explained in his declaration, submitted in reply on the instant motion, Doc. 88 at 16-17, Exhibit 4 hereto (along with Prof. Olsen's statement of qualifications), *his* reasons for dismissing that appeal, by not filing an opening brief, and yet the Mag. Judge completely ignored his declaration and that reply. *Finley* was not dismissed for any improper reason, such as inadequacy of counsel.

The Mag. Judge erroneously states that "[i]n his reply, he [Mr. Yagman] points to other attorneys who could argue on behalf of the class on appeal, if needed. (Do. 88 at 3.) He does not, however, provide declarations from them or

any information about their qualifications. (Id.)" R&R at 12, n. 5.[3] This is not so.

Judge Reichmann's declaration *was submitted* as part of the reply on the motion to

certify, and appears at pages 16-17 of that motion, and it sets forth his

qualifications, yet the Mag. Judge states the opposite of this. (When the reply was

due and was submitted, no declaration from Marion R. Yagman was submitted

because, in August, 2024, Ms. Yagman (who is British) was at her home in

Bournemouth, England (where she spends the summers), and Mr. Yagman did not

want to bother her, and believed that, on this issue, Judge Reichmann's declaration

would be sufficient. It was not imagined that the Mag. Judge possibly would

ignore it.) Also, it was not imaged that Prof. Olsen would need to submit her

declaration.

    4. Mr. Yagman's 35-year-old and 26-year-old, 1989 and 1998 California Bar

suspensions should have no bearing on this matter, and were deemed to be wholly

irrelevant to his ability to practice law again when they were considered in 2021,

when the California State Bar Court and then the California Supreme Court

(unanimously) re-instated him as a member of the California Bar in 2021, and then

the Chief Judge of this Court reinstated him as a member of the Bar of this Court,

also in July 2021. The State Bar Court Decision is attached hereto as Exhibit 2.

Among other things, it sets forth Mr. Yagman's extensive *pro bono* activities,

which continue to this date.

    In its reinstatement Decision, the State Bar Court held as follows:

    Seventy-five-year-old petitioner, Stephen Yagman, seeks
    reinstatement to the practice of law after his summary disbarment in year
    2010, flowing from a 2007 conviction for bankruptcy fraud. The court is

---

[3] Both Judge Reichmann's qualifications and Prof. Olsen's qualifications were
attached to the reply, and are attached hereto, so that the Mag. Judge's statement
that they were not attached is inaccurate.

challenged to answer whether Yagman has demonstrated overwhelming proof of reform, showing evidence of rehabilitation in light of the moral shortcomings that previously resulted in discipline. (Feinstein v. State Bar (1952) 39 Cal.2d 541, 546; Hippard v. State Bar (1989) 49 Cal.3d 1084, 1092.) Having considered the evidence of Yagman's pro bono services and volunteer teaching, remorse and evolution in thinking, present good character, and Yagman's recent Freedom of Information Act ("FOIA") litigation where the judge [Richard A. Paez, of the Ninth Circuit] described him as honest and acting with integrity—weighing that against the fraudulent misconduct underlying the 2007 conviction, this court finds that Yagman has met his heavy burden for reinstatement.

. . .

After consideration of the facts and the law, the court concludes that Stephen Yagman's reinstatement to the practice of law is warranted. Along with satisfying the other requirements, Yagman has proven by clear and convincing evidence the requisite good moral character for reinstatement, comprising "overwhelming[] proof of reform. . . which we could with confidence lay before the world in justification of a judgment again installing him in the profession.[] [Citation]." (In re Menna, supra, 11 Cal.4th at p. 989.) It is recommended that the petition for reinstatement be GRANTED and that petitioner Stephen Yagman be reinstated to the practice of law in California . . . .

Decision (Cal. State Bar Court, Jan. 29, 2021) 1 & 27. This puts paid to the matter regarding the bar disciplinary matters.

Also, very soon, the California State Bar will enact a 3that will mandate expungement of these two matters, because they are more than eight years old. *See* Exhibit 3 hereto.

The next numbers, 6- 9 have to do with another homeless action, *Boring v. Murillo*, which the Mag. Judge has transported into the instant action, but which have no place in this action, because they are idiopathic and idiosyncratic to that action.

6.  The Mag. Judge refers to "one occasion in *Boring*[] [in which] Mr. Yagman filed a non-substantive opposition to a motion to dismiss the entire action

7

alleging that Defendants failed to meet and confer[] . . . [and w]hen ordered to meet and confer at the courthouse, he failed to appear and later failed to explain his 'no show.'" Doc. 92 at 13:5-9. This all is immaterial because it was entirely proper to file a non-substantive opposition, because defense counsel admittedly had refused to participate in a L.R. 7-3 conference, Judge Carter ordered that one be held, Doc. 135, *pre-excused it not being held* "[i]f Plaintiff's counsel is unable to attend at this date, time, and location, then the parties are excused from meeting and conferring prior to Defendants moving again to dismiss the Corrected Fifth Amended Complaint," *ibid.*, Exhibit 1 hereto, and Judge Carter ultimately denied the motion to dismiss. Doc. 145. Truly, this is no harm-no foul. There was absolutely nothing amiss about Mr. Yagman filing a procedural, non-substantive objection to the motion to dismiss, which motion ultimately was denied, and him attending the meeting. It is much to do about nothing. And, it is petty.

7. There were no "'missteps' in this case and other related cases [that] reveal a risk of prejudice to the class." Doc. 92 at 13:11-12. This is absurd. Defense counsel in both cases very obviously want to do what then Ninth Circuit Chief Judge Alex Kozinski stated in County of Los Angeles v. U.S. Dist. Ct. (Forsyth v. Block), 223 F.3d 990 (9th Cir. 2000), "[C]ounsel, Stephen Yagman, has a formidable reputation as a plaintiff's advocate in police misconduct cases; defendants in such cases may find it advantageous to remove him as an opponent[,]" and that Ninth Circuit Judge Stephen R. Reinhardt previously had stated 13 years earlier, in Armster v. U.S. Dist. Court, 817 F. 2d 480 (9th Cir. 1987), "[Stephen] Yagman's vigilance in the protection of his client's constitutional rights served all citizens. His fortitude and tenacity in the service of his civil rights clients exemplifies the highest traditions of the bar. As Justice Brandeis noted, '[t]he great opportunity of the American Bar is and will be to stand . . . ready to protect the interests of the people.'" Ninth Circuit Judge Richard A. Paez commented on Mr. Yagman's competence, testifying as a witness for him in

his State Bar reinstatement proceeding: **"Mr. Yagman is a truly dedicated
lawyer . . . . He was a forceful lawyer[] [and c]learly believed in the cases that
he was litigating on behalf of his clients. . . . I think he adds to the bar[,] . . .
[t]he work that he does is very important. There are not a lot of lawyers who
engage in this kind of practice of law. . . . [T]hese cases [are] hard fought.
They're very difficult. . . . Mr. Yagman believed in his work and he litigated
forcefully. . . . Mr. Yagman is a strong, forceful lawyer. . . . [T]here are very
few people that can really try a very complicated civil rights excessive force
case. To do it competently, and do it thoroughly, and effectively[] I put Mr.
Yagman in that category because I saw it. I witnessed it firsthand." Former
District Judge J. Spencer Letts commented on Mr. Yagman's competence:**
"The court doubts that any lawyer in the greater Los Angeles area, other than
plaintiffs' lead counsel [Stephen Yagman], would or could have represented them
[plaintiff robbers] in this case, and devoted the time, effort and skill which it took to
produce the verdict." Stephen Yagman displayed "extraordinary skill and
dedication necessary for counsel to prevail." Gomez v. Gates, 804 F. Supp. 69
(C.D. Cal. 1992). Last, Judge Dean D. Pregerson testified as follows, in support of
Mr. Yagman's Bar reinstatement: "Mr. Yagman handled many important cases of
constitutional significance before me. He also struck me as being genuinely
motivated to help his clients and vindicate their rights. It also appeared to me that
Mr. Yagman fulfilled an important constitutional niche, in that he would take
tough cases for plaintiffs who otherwise would be likely not to have had the
benefit of counsel . . . . [Mr. Yagman's] role [is] as an important voice for
unrepresented clients."

>There were no "problems meeting discovery deadlines[,]" whether
"created, in part, by confusion over counsel's filing of apparently duplicative
actions. (Finley, Dkt. 386.)" There are no "duplicative" actions, because the
actions involve different ordinances. Defendant Mayor Bass' apex deposition was

denied only because plaintiffs had not first taken other discovery, and the discovery cutoff date remains at Oct. 30. The confusion was immaterial. No deadline was not met.

>Plaintiffs' counsel filed motions for preliminary injunctions with the evidence at hand at the time the motions were filed, and one was granted, but a proposed order was not properly recorded in the Judge's Proposed Order file: otherwise the PI motion would have been granted with the evidence tendered, so that this "no evidence" deficiency was immaterial.

>Counsel had no "difficulty following [undefined] court orders, presenting evidentiary support when [none was] required, and working with opposing counsel to accomplish routine tasks like scheduling . . . ." Certification indeed was granted in 6003, with the same evidence presented in this action.

There simply is no basis for finding plaintiff's chosen, *pro bono* counsel to be inadequate, and there is no other counsel available.

8. No intentional representations were made to the court in the *Boring* matter. Mr. Yagman did meet and confer with defense counsel, her statement to the contrary notwithstanding. Mr. Yagman did not refuse to comply with any court order, but simply made a mistake in a long complaint.

In fact, the Mag. Judge's R&R's statement that Mr. Yagman "made intentional misrepresentations to this Court (e.g. Dkt. 173-1 at ¶ 10 ("Mr. Yagman falsely certified to the court that he had met and conferred with Defendants' counsel"))" is *not* a court finding, but instead is a contention by defense counsel, in another case, and it is false. Moreover, the R&R's statement that "'he [Mr. Yagman] has failed or refused to comply with this Court's orders (e.g. Dkt. 118 ("Plaintiffs now 'conceded that their operative, Fourth Amended Complaint did not fully comply with the court's order dismissing, with leave to amend, the Third Amended Complaint"))." (See Boring v. Murillo, case no. 2:21-cv-07305-DOC-

KES, Dkt. 178 at 20.)", again is ***not*** a court finding, but instead is a contention by defense counsel in the same, other case, and it is false.

To permit false statements by a defense counsel in another case to be the basis for disqualification of class counsel in the instant case would be inappropriate, as is their use for this purpose in the R&R.

*****

The R&R should be accepted as to all parts and rejected as to the adequacy of class representative part and adequacy of class counsel part, with the Court finding David Jacobs to be an adequate class representative and the law firm of Yagman + Reichmann, LLP to be an adequate class counsel, as it found in the *Finley* action.

Respectfully submitted,

**YAGMAN + REICHMANN, LLP**

By:                                    

**STEPHEN YAGMAN**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 1

Case 2:22-cv-08010-DOC-KES   Document 95   Filed 09/06/24   Page 13 of 55   Page ID
#:773
Case 2:21-cv-07305-DOC-KES   Document 135   Filed 04/15/24   Page 1 of 1   Page ID
#:2559

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

## CIVIL MINUTES – GENERAL

Case No. 2:21-cv-07305-DOC-KES                    Date: April 15, 2024

Title: P. BORING V. CATHY MURILLO ET AL.

PRESENT:     THE HONORABLE DAVID O. CARTER, U. S. DISTRICT JUDGE

Karlen Dubon                              Not Present
Courtroom Clerk                        Court Reporter

ATTORNEYS PRESENT FOR            ATTORNEYS PRESENT FOR
PLAINTIFF:                                        DEFENDANT:
None Present                                    None Present

**PROCEEDINGS (IN CHAMBERS):   ORDER GRANTING**
**DEFENDANTS' EX PARTE**
**APPLICATION [133]**

When the Santa Barbara Defendants moved to dismiss the Corrected Fifth Amended
Complaint (Dkts. 122, 123), the only opposition Plaintiff briefed for the Court was Defendants'
failure to meet and confer adequately (Dkt. 124). When the Court gave the parties more time to
meet and confer (Dkt. 128), Plaintiff's counsel objected that it was a waste of time (Dkt.
130). Now Defendants have filed an ex parte application asking the Court to set the time and
location of the conference because Plaintiff's counsel is only willing to meet and confer in
person at his home office, to which Plaintiff objects (Dkts. 133, 134).

When counsel both object to meeting at each other's office, the typical compromise is to
meet at some neutral location. Since the parties cannot agree on one, to resolve this dispute and
maintain the current briefing schedule, the Court GRANTS Defendants' ex parte
application. The parties shall meet and confer for at least 30 minutes at the Santa Ana Federal
Courthouse at the mutually agreed upon time— April 16th at 12pm. The parties shall report to
the attorney lounge at that time for the conference. If Plaintiff's counsel is unable to attend at
this date, time, and location, then the parties are excused from meeting and conferring prior to
Defendants moving again to dismiss the Corrected Fifth Amended Complaint.

The Clerk shall serve this minute order on the parties.

Initials of Deputy Clerk: kdu

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 2

# Public Matter

# FILED

## Jan 29 2021

**STATE BAR COURT
CLERK'S OFFICE
SAN FRANCISCO**

## STATE BAR COURT OF CALIFORNIA

## HEARING DEPARTMENT—LOS ANGELES

In the Matter of )
) Case No. SBC-19-R-30724-PW
)
STEPHEN YAGMAN, )
) DECISION
Petitioner for Reinstatement. )
)

Seventy-five-year-old petitioner, Stephen Yagman, seeks reinstatement to the practice of law after his summary disbarment in year 2010, flowing from a 2007 conviction for bankruptcy fraud.

The court is challenged to answer whether Yagman has demonstrated overwhelming proof of reform, showing evidence of rehabilitation in light of the moral shortcomings that previously resulted in discipline. (*Feinstein v. State Bar* (1952) 39 Cal.2d 541, 546; *Hippard v. State Bar* (1989) 49 Cal.3d 1084, 1092.)

Having considered the evidence of Yagman's *pro bono* services and volunteer teaching, remorse and evolution in thinking, present good character, and Yagman's recent Freedom of Information Act ("FOIA") litigation where the judge described him as honest and acting with integrity—weighing that against the fraudulent misconduct underlying the 2007 conviction, this court finds that Yagman has met his heavy burden for reinstatement. So, the court recommends that Yagman be reinstated upon payment of all applicable fees and costs.

## Procedural History

Yagman was summarily disbarred by the California Supreme Court, effective December

22, 2010 (*Yagman on Discipline*, Supreme Court case number S186152), as a result of his 2007

felony conviction for bankruptcy fraud in violation of Title 18 of the United States Code, section

157 (August 20, 2010 Order, State Bar Court case number 06-C-13000). (See Evid. Code, §452

[judicial notice].)

On December 30, 2019, Yagman filed this Petition for Reinstatement attaching his

history of discipline including the 1997 decision, *In the Matter of Yagman* (Review Dept. 1997)

3 Cal. State Bar Ct. Rptr. 788.

On June 8, 2020, the Office of Chief Trial Counsel of the State Bar (OCTC) filed a

response to the Petition, opposing Yagman's reinstatement. Though OCTC does not challenge

Yagman's satisfaction of the pre-filing procedural requirements, the substantive issues of

rehabilitation and present moral fitness are in dispute. (See Rules Proc. of State Bar, rules 5.441

[filing requirements], 5.445 [Burden of Proof].)

Trial began on November 17, 2020 with Petitioner's case and continued through the next

day, November 18.[1] OCTC's case was presented in the afternoon of November 19, 2020, moving

into evidence records from Yagman's criminal conviction. Trial was held remotely on the Zoom

platform under the California Rules of Court, Emergency Rule 3, adopted by the Judicial Council

(eff. April 6, 2020). Yagman was principally represented by Rex Beaber; some of the pretrial

briefing and submission of exhibits were jointly prepared by Yagman and Beaber and Yagman

---

[1] This court was assigned this matter for trial on November 10, 2020, following recusal
by the previously-assigned judge. (See Code of Civil Procedure section 170.1, subdivisions
(a)(6)(A)(i) and (iii); Rules Proc. of State Bar, rule 5.46(C).)

-2-

argued some motions during trial.[2] Attorneys Kelly McNamara and Kevin Bucher appeared for
OCTC.

This matter was ordered submitted for decision on December 9, 2020, the date concurrent
closing briefs were due. (See Rules Proc. of State Bar, rule 5.111(A) [post-trial briefing allowed
on good cause showing].) Apart from his closing brief, Yagman filed two additional post-trial
briefs, opposed by OCTC: "Motion no. 3, that court accept a complete Exhibit 1002" (filed on
November 20, 2020); and "Motion to Strike Respondent's: (1) References to Exhibit 005[;] and
(2) Contentions . . . Unsupported by Record" (filed on December 10, 2020).

Over OCTC's objection, the court will admit the proposed addendum to Exhibit 1002,
finding no prejudice—the addendum does *not* introduce new evidence but rather a declaration
authenticating the letter written in 2007 and affirming the contents and views expressed therein.[3]
(Similar addendums were admitted without objection relating to the other letters offered under
the same circumstances.) Under principles of due process and fairness, the one-page addendum
is accepted. (See generally, Evid. Code, §356 [rule of completeness.].)

Regarding Yagman's motion to strike OCTC's argument, this is denied for two reasons.
One, the motion was filed after this matter was already ordered submitted. And separately,
argument of counsel is simply argument. Only those arguments supported by the record will be

---

[2] OCTC raised the issue of Yagman's designation as co-counsel given his status as a
disbarred attorney. (See Rules Proc. of State Bar, rule 5.4(5).) Because the Rules of Procedure do
not require a petitioner to retain counsel, this court recognized Yagman's right to argue on his
own behalf—as any *pro per* petitioner is so entitled under the rules. (See generally, Rules of
Proc. of State Bar, rules 5.440(C) [reinstatement begins by filing and serving petition], 5.441
[filing requirements].)

[3] The two-sentence declaration reads: "I, KENNETH SPIELFOGEL, declare the
following to be true under penalty of perjury at, pursuant to 28 U.S.C. § 1746, on the date set
forth below my signature hereinbelow. My October 11, 2007 letter that is attached hereto was
written by me on that date and its contents were correct on that date." It is signed with the date
appearing "10-22-20."

considered, and Yagman's hearsay objections to OCTC's exhibits were previously noted at trial. (See Rules Proc. of State Bar, rule 5.104.)

### Jurisdiction

Yagman was admitted to the practice of law in California on August 31, 1976; and disbarred on December 22, 2010. On December 30, 2019, Yagman filed this Petition under rules 5.440 et seq. of the Rules of Procedure of the State Bar.

### Requirements for Reinstatement

Rule 5.445(A) of the Rules of Procedure of the State Bar provides that a petitioner for reinstatement who has been disbarred must:

1. pass a professional responsibility examination within one year prior to filing the petition;

2. establish rehabilitation;

3. establish present moral qualifications for reinstatement; and

4. establish present ability and learning in the general law by providing proof that they have taken and passed the Attorneys' Examination administered by the Committee of Bar Examiners within three years prior to filing the petition.

The petitioner must also submit proof that they have paid all discipline costs and have reimbursed all payments made by the Client Security Fund (CSF) as a result of the prior misconduct. (Rules Proc. of State Bar, rule 5.441(B)(2).)

### Findings of Fact

Here, the court finds that Yagman has met the procedural requirements for the filing of reinstatement: passage of both the Attorney's Examination and the Multistate Professional Responsibility Examination; timely application for reinstatement; submission of fingerprints as required; evidence that all discipline costs have been paid; and no outstanding payments requiring reimbursement to the Client Security Fund—none owed, here. (Rules Proc. of State Bar, rule 5.441(B); see Petition and attached exhibits.)

-4-

The contested issues relate to the remaining substantive inquiries into rehabilitation and present moral fitness, interrelated but independent requirements. (Rules Proc. of State Bar, Rule 5.445(2) and (3).) Because rehabilitation and fitness are measured against the prior misconduct (*Feinstein, supra,* 39 Cal.2d at p. 546), the court first addresses below, the facts of Yagman's underlying 2007 conviction for bankruptcy fraud and other crimes.

## 1. Underlying misconduct—crimes involved moral turpitude.[4]

Yagman's underlying misconduct was extremely serious as the crime and underlying misconduct involved moral turpitude. Moral turpitude is that which reflects "a deficiency in any character trait necessary for the practice of law (such as trustworthiness, honesty, fairness, candor, and fidelity to fiduciary duties) or it involves such a serious breach of a duty owed to another or to society, or such a flagrant disrespect for the law or for societal norms, that knowledge of the attorney's conduct would be likely to undermine public confidence in and respect for the legal profession." (*In re Lesansky* (2001) 25 Cal.4th 11, 16.)

Yagman's crimes, as described below, involved multiple deceptive acts over an extended period of years, harmed third-party creditors, and potentially exposed Yagman's legal partners to criminal and financial liabilities. And, though not misconduct engaged while in the actual practice of law, Yagman's misdeeds involved his legal practice to the extent that a corporate bankruptcy was filed and fraud perpetrated.

---

[4] The following summary is derived from OCTC's exhibits, some admitted over Yagman's objection, Exhibit 5 (first superseding indictment) and Exhibit 21 (excerpt of trial transcript, court's reading of instructions to the jury). The court ruled that these records were relevant and properly authenticated. (See Rules Proc. of State Bar, rule 5.104(H)(2)(e) [foundation for records retrieved from PACER].) But nonetheless, the court noted Yagman's hearsay objection as to uncorroborated facts. (See Rules Proc. of State Bar, rule 5.104(D).)

**A. The government alleged acts of fraudulent financial reporting and dealings.**

By the end of 1999, Yagman incurred business and personal debts including an outstanding federal tax debt of over $158,000, unpaid federal payroll taxes close to $29,000, and state income taxes shy of $58,000. Both the federal and state authorities sent tax delinquency notices, later filing for liens and levies on Yagman's assets.

In November 1999, Yagman filed a petition under Chapter 7 on behalf of his firm, Yagman and Yagman[5] in the United States Bankruptcy Court for the Central District of California. The petition listed $2,501 in assets and $903,066 in liabilities (including $70,000 owed to the Internal Revenue Services (IRS)). The indictment alleged that Yagman failed to list pending settlements which would garner attorney's fees for his new firm, Yagman, Yagman & Reichmann.[6] The underlying documents in support of the petition were executed under penalty of perjury. This petition was dismissed on May 8, 2002, after Yagman failed to cooperate with the bankruptcy trustee's attempt to identify assets.

On December 28, 1999, Yagman filed a personal Chapter 7 bankruptcy petition in the United States Bankruptcy Court in the state of New York. In that petition, Yagman claimed $2,100 in assets; and $775,495 in liabilities, including for state and federal taxes owed. The schedules and supplemental documents evidencing his financial condition were executed under penalty of perjury. In October 2000, the bankruptcy court granted the petition, discharging Yagman's personal debts.

The government posited that Yagman filed the two bankruptcy petitions and associated documents for the purpose of evading the IRS and other creditors. In both the personal and

---

[5] This was a partnership with his former wife, Marion Yagman, who testified in these proceedings.

[6] Joseph Reichman testified as a character witness in these proceedings.

corporate bankruptcy petitions, Yagman concealed an asset in a fee-sharing legal matter that was

pending at the time. When the fees were received in July 2000, Yagman directed the firm's

portion of $150,000 be made out to his law partner (Marion Yagman), who deposited it into the

firm's bank account, describing it as a loan to the firm from her, of which Yagman took about

half.[7] And, the government theorized that Yagman controlled other bank and brokerage accounts

in which funds were generated and undisclosed to the bankruptcy creditors.[8]

### B. Yagman was convicted of tax evasion, bankruptcy fraud, and the making of unlawful monetary transactions; and sentenced to 36 months in prison.

In 2006, a federal grand jury returned a 19-count indictment against Yagman, charging

him with one count of attempting to evade federal income taxes (Count 1—18 U.S.C. §7201),

one count of bankruptcy fraud (Count 2—18 U.S.C. §157), and seventeen counts of engaging in

monetary transactions in criminally derived property (Counts 3 through 19—18 U.S.C. §1957).

(See Exh. 5 [First Superseding Indictment, filed June 1, 2006].)

The tax evasion and bankruptcy fraud allegations stemmed from conduct allegedly

committed roughly from April 1998 through May 2002; and the monetary transactions consisted

of sixteen deposits by check from one account to another during the period of January 2000

through April 2002 and one transfer of assets between brokerage accounts in May 2004.

---

[7] This is the underlying conduct which supported the jury's conviction of Count Seven concerning an improper monetary transaction. (See Bus. & Prof. Code, §6101, subd. (a) [by record of conviction, actor is conclusively presumed to have committed all of the elements of the convicted crime]; see also Rules Proc. of State Bar, rule 5.104(D) [consideration of hearsay].)

[8] The indictment alleged thirty-three separate acts which involved setting up various accounts to hide income and assets, including a corporate account in New York for Yagman & Yagman; a bank account opened by Yagman in the name of his girlfriend; and a brokerage account in the girlfriend's name from funds totaling $776,000 from family members.

On this record, this court does not presume which of the thirty-three affirmative acts were shown to establish Yagman's evasion of the payment of taxes, as the jury was not required to find which particular act(s) to be true. (See Bus. & Prof. Code, §6101, subd. (a).)

Following the jury's guilty verdict, the trial court ordered Yagman to serve 36 months in

prison for each of the following counts: Count 1 (tax evasion); Count 2 (bankruptcy fraud); and

Counts 3 through 8, 12, 15 through 17, and 18 (unlawful monetary transactions)[9]—all terms to

run concurrently. Yagman was ordered to self-report to the Bureau of Prisons to begin serving

his sentence on January 15, 2008.[10]

The prison commitment was to be followed by supervised release with delineated

standard and special conditions. Those special conditions included financial oversight by a

probation officer, including Yagman's cooperation in signing a release authorizing disclosures of

credit reporting, tax returns, and other financial statements; a prohibition from seeking out a loan

or line of credit without approval from probation; a limit to holding only one personal checking

account; and a prohibition from engaging in any monetary transactions of over $500 without

approval. (Exh. 12 [Commitment].)

Though standard fines and fees were imposed, there was not an order requiring Yagman

to make whole any creditors harmed as a result of the crimes, nor did the commitment order

reference collateral asset forfeiture proceedings.

**C. The Review Department of the State Bar Court summarily disbarred Yagman.**

Based on the federal conviction for bankruptcy fraud, the Review Department of the State

Bar Court placed Yagman on interim suspension effective August 23, 2007. And after the

conviction became final, recommended to the Supreme Court that Yagman be summarily

disbarred as provided under Business and Professions Code section 6102, subdivision (c),

---

[9] Yagman was not convicted on Count 19, the one transfer between brokerage accounts in May 2004, or Counts 9 through 11, 13, and 14, various deposits in June, July, and October 2011 and a July 2011 withdrawal of $12,000 made payable to a specific person.

[10] Yagman testified that he began his commitment on March 31, 2008, in a federal prison in North Carolina. Whether Yagman's actual incarceration period began January 15 as ordered, or the deadline extended to March 31, is not a factual conflict this court needs to resolve.

reasoning that Yagman's bankruptcy fraud conviction involved the intent to defraud, thereby

necessarily involving moral turpitude. (August 20, 2010 Order, State Bar Court case number 06-

C-13000; see also Exh. 23 [affirmance on appeal].)

## 2. Evidence of rehabilitation—positive post-conviction and post-release conduct.

In demonstrating rehabilitation from these serious and fraudulent acts,[11] Yagman

presented his own testimony of his volunteerism and post-conviction conduct, including

providing legal assistance to inmates during his incarceration and making whole his bankruptcy

creditors. Yagman also presented Professor Frances Olsen as a witness, documenting Yagman's

over 10-years of volunteer teaching of undergraduate classes at UCLA.

### A. Yagman assisted inmates while incarcerated and taught a weekly class on the law.

Yagman testified that while incarcerated, he taught a weekly course on the law and

habeas corpus fundamentals to a rotating class of 15 inmates. He purchased and ordered the

federal reporters and stocked the law library with advance sheets and gave out copies of the

United States Constitution to his students. Yagman also helped inmates with administrative

grievances and legal work. Yagman estimated that he helped inmates in preparing 43 federal writ

petitions or actions.

For these good acts, the court considers Yagman's efforts as work towards rehabilitation,

though not conclusive proof of its achievement. The "jailhouse lawyer" serves an important

function to provide fundamental access to the courts for the incarcerated, who are often

functionally illiterate. (See *Johnson v. Avery* (1969) 393 U.S. 483 [held as unconstitutional, state

prison regulation barring inmates from assisting others in preparing writs of habeas corpus].)

And, Yagman's productive use of time while incarcerated is suggestive of his ability to function

---

[11] Though Yagman objected to the unfounded hearsay in the Indictment, he nonetheless
agreed during his testimony that his misconduct was serious and involved fraud.

as a rehabilitated citizen. (See *In re Shaputis* (2011) 53 Cal.4th 192, 221 [progress during incarceration is a factor in granting release on parole].)

To the extent OCTC relies on *In re Menna* (1995) 11 Cal.4th 975, 989, in arguing that performance while in custody should not be considered, the court disagrees. Though good behavior in prison and on parole, *alone*, is insufficient to establish sustained rehabilitation, this court is not prohibited from giving these efforts some weight in answering the question of overall rehabilitation.

Neither does the court read *In re Gossage* (2000) 23 Cal.4th 1080, to disallow consideration of Yagman's efforts in custody. There, Gossage's lack of rules violations while serving his sentence was not given weight where he repeatedly continued to violate the law for five-years *post*-release. (*Id.* at 1100-1101.) So, the court looked at the period post-completion of parole to determine whether Gossage had rehabilitated. (*Id.* at p. 1099.) Unlike Gossage, here, Yagman has had no further arrests since his release and Yagman did more than avoid a rules violation—he provided inmates fundamental access to the courts through his help and the holding of weekly classes. So, the court acknowledges Yagman's positive contributions while incarcerated.

Separately, the court disagrees with OCTC that Yagman's work while in custody is diminished because he skirted the boundaries of practicing law as a disbarred attorney. OCTC did not present evidence that Yagman held himself out as an attorney, represented himself as counsel to the inmates, opposing counsel, or to the courts[12]—nor that he was disbarred by a

---

[12] Yagman testified that he did litigate *Bivens* claims (*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics* (1971) 403 U.S. 388) in federal court as a *pro per* inmate, among a class of inmates including his cellmate, Schwarz. As a harmed party, he had a right to access the courts as a *pro per* plaintiff.

-10-

federal court.[13] (See *e.g.*, *Allen v. State Bar* (1962) 58 Cal.2d 912, 914-915 [rejecting argument that petitioner engaged in unlawful practice of law where he conducted legal research for an attorney; borrowed advance sheets from two attorneys and discussed the law; helped a candidate prepare for the bar examination; and participated in a licensing hearing involving a company that he worked for, including asking questions of witnesses and editing a brief].)

In sum, the court finds, and deems relevant, Yagman's service bridging the gap to justice for inmates while incarcerated.

### B. The record is absent of any violations on supervised release.

After Yagman completed his custodial sentence, it was followed by federal supervised release with conditions—among them, was close supervision involving financial reporting and submission of records. OCTC offered no evidence showing Yagman's violation of any of these terms.

Though Yagman volunteered during his testimony that he served an additional four-months beyond his original May 2010 release, the court accepts Yagman's credible testimony of the absence of any willful and knowing violation of release conditions. Yagman testified that after his May 2010 release to a "halfway house" from prison, he was brought back into custody at Los Angeles Metro Detention Center (LA MDC) in July 2010. (See 18 U.S.C. §3563, subd. (B)(10) and (11) [conditions of release and residential placement].) This additional incarceration period flowed from a purported positive drug test owing to Yagman's consumption of his lawfully-prescribed medication. After filing his own habeas petition, Yagman was ultimately released on November 8, 2010.

---

[13] While admission to practice before a federal court is derivative from membership in a state bar, disbarment by a state does not automatically disbar one from practicing in federal court. (See *In re Ruffalo* (1968) 390 U.S. 544, 547.) There is also no established uniform procedure for suspension and disbarment proceedings in the federal district courts. (See *In re Echeles* (7th Cir. 1970) 430 F.2d 347, 350.)

This court finds that Yagman testified credibly about his return to LA MDC. He offered
this narrative to the court without direct prompting (in response to OCTC's question of how he
knew inmate Schwarz), and OCTC presented no evidence giving any reason to doubt Yagman's
explanation. So, the record is absent of any willful violation of supervised release conditions.

### C. Yagman satisfied restitution owed to his bankruptcy creditors.

As further evidence of rehabilitation, Yagman testified that all bankruptcy creditors have
been paid. Yagman testified that, by 2006, he had paid three of his creditors, JM ($25,000); AM
($43,000); and RS ($25,000).[14] And, by 2017, Yagman was able to provide to the bankruptcy
trustee a sum of $368,000 to distribute to the remaining creditors. Yagman explained that he
inherited the estate of his late uncle in 2011 ($328,000) and was able to add his own funds to
make the creditors whole.

Though these distributions were not required as part of the federal sentence, Yagman
conceded that there was an ongoing issue of asset forfeiture. He clarified that there had been a
federal claim at the start, but that he satisfied the creditors and the government withdrew its
claim.

In arguing this evidence is unpersuasive in showing rehabilitation, OCTC raises that the
manner in which Yagman paid the creditors belies true reformation as Yagman was not "free to
make" the three payments to creditors at that time because his assets would have been under the
control of the bankruptcy trustee. And that the payments to the remaining creditors were not
laudatory in the face of the federal forfeiture.

---

[14] Though the creditors' full names were used at hearing, this court will use their initials
out of any potential privacy concerns.

The court rejects the first argument as OCTC did not present any evidence that the

payments to JM, AM, and RS were improper or somehow represented further misconduct.[15] (Cf.

*In the Matter of Rudnick* (2007) 5 Cal. State Bar Ct. Rptr.27, 36-37 [finding that manner of

repayments failed to demonstrate rehabilitation where monies were ordered as a condition of

criminal probation, and where some victims were paid from petitioner's theft proceeds].)

Regarding the latter argument, though the remaining payments may not have been spontaneous,

the payments nonetheless ameliorated some of the harm caused by Yagman's criminal actions—

a relevant factor to the inquiry of reinstatement. (See *Hippard*, *supra*, 49 Cal.3d at p. 1088.)

### D. Yagman began voluntary teaching at UCLA before serving his federal sentence and has resumed teaching since his release.

Professor Frances Olsen, a law professor at UCLA, testified about Yagman's contribution

in teaching undergraduate students in legal studies. Having met Yagman at a conference in 1985,

Professor Olsen was impressed and continued following Yagman's career as a "public figure" in

civil rights work. She later came to know him personally after being contacted by one of

Yagman's criminal defense attorneys in the underlying conviction matter.

Sometime after Yagman's conviction in June of 2007, but before sentencing, Yagman's

counsel approached Olsen. Yagman's counsel sought to present a public service alternative to

incarceration and Olsen agreed to co-teach an undergraduate class on legal theory and practice

with Yagman. Olsen presented the theory while Yagman presented his perspective as a

practicing attorney.

Though the federal court did not impose the alternative sentence the defense proposed,

Yagman continued to teach without compensation up to the time of his surrender (January 2008)

---

[15] Yagman's personal bankruptcy petition was granted in October 2000 and all his personal debts were discharged. (Findings, 1(A), *supra*.) And, there was no evidence presented concerning an active bankruptcy petition at the time Yagman issued payments to the creditors.

-13-

and returned to teaching after his release (in late 2010). The course being taught evolved over the years and now the focus is on civil remedies and police brutality.

In Olsen's opinion, Yagman teaches as public service and for no other reason but to benefit society. Though Yagman's initial involvement in 2007 was not spontaneous remorse as recognized under standard 1.6(g),[16] his continued volunteerism, not tethered to the criminal conviction and sentence, is given substantial consideration by this court. (*In the Matter of Brown* (Review Dept. 1993) 2 Cal. State Bar Ct. Rptr. 309, 317 [recognizing weekly pro bono legal services for four years as a significant factor in petitioner's favor].)

### E.  Post-release, Yagman performed paralegal and law-related volunteer work.

After release from custody, Yagman also continued his engagement in the study of law by volunteering his time to participate in mock moot courts and providing paralegal services for modest compensation.

Attorney Marcy Tiffany who specializes in the niche area of civil rights and special education, has known Yagman for some period before his incarceration and post. Though their acquaintanceship was not of constant involvement, Tiffany sought Yagman's guidance over the years, including the period since Yagman's release from prison. Yagman has been generous in sharing his time and expertise and participating in mock moot court in preparing Tiffany for oral argument.

Marion Yagman (Marion),[17] former wife and former law partner, testified that she has relied on him since his release from prison owing largely to her developing health issues. As a

---

[16] Reference to the standard comes from Rules Proc. of State Bar, tit. IV, Stds. For Atty. Sanctions for Prof. Misconduct. (See generally, *In re Glass* (2014) 58 Cal.4th 500, 521 [because moral fitness is evidenced by acts of moral turpitude, concepts borrowed from disciplinary proceedings often considered in reinstatement proceedings].)

[17] The use of the witness's first name is to avoid confusion with Petitioner Yagman; no disrespect is intended.

-14-

paralegal, Yagman provided both his legal skills and practical help (driving Marion and moving

boxes) without thought of any monetary compensation. For example, in 2014, Yagman provided

his assistance for a matter in an outlying county (Fresno) that required a lot of driving and

physical labor, which Marion was unable to do. The case was retried in January 2020, where

Marion relied on Yagman once again for physical assistance.

In another matter, also tried in 2014, Marion represented a mentally ill, incarcerated

client in Los Angeles County Jail. The matter was both physically and emotionally difficult for

Marion, who leaned on Yagman for research and paralegal work in addition to client

handholding. By Yagman's ability to listen and calm the client, the client was better positioned

to testify. In 2017, the case was won, and Marion decided to compensate Yagman from this

award for the work he had performed without compensation from 2010 to 2017.

In sum, since his release from custody, Yagman demonstrated that he has stayed engaged

with the law.

## 3. Present Moral Fitness—credible character witness testimony and Yagman's expression of remorse.

### A. Observations of character witnesses universally described Yagman as honest and remorseful.

Seven witnesses, including sitting and retired judges (Hon. Christina Snyder; Hon.

Richard Paez; Hon. Alex Kozinski [ret.]), attorneys (Joseph Reichmann, Tiffany, and Marion),

and a law professor (Frances Olsen) testified to Yagman's character. In addition, Yagman

presented approximately 30 reference letters or declarations in support of his reinstatement from

former clients, colleagues in the legal community (including former U.S. Attorney General

Ramsey Clark and former Chief Special Prosecutor for New York City Leon Baer Borstein),

friends who have known him for decades (including his former philosophy professor William

James Earle, and Dr. Bernard L. Rosenfeld), judges, and public figures.[18] These individuals

represent a fair cross-section of the general and legal communities, most have known or

observed Yagman for a lengthy period of time, and all attested to Yagman's honesty and

integrity.

While this court finds Yagman's witnesses generally credible, the court also

acknowledges OCTC's argument that *some* of the witnesses' testimony carry less weight. First,

at least two witnesses have a bias which presents credibility concerns and diminishes the weight

of their respective testimony. Particularly, Yagman's former business partners, Marion Yagman

and Joseph Reichmann, each claimed they were not aware of the details of the crimes; yet,

Yagman's conduct would have directly had an impact on their practice as partners at the time

(i.e., award(s) from pending suit(s) and claims by bankruptcy creditors). And as OCTC stresses,

Marion and Reichmann have a personal interest in the outcome of these proceedings given their

former partnership and current relationship with Yagman. So, on these grounds, the weight of

these two witnesses are diminished as character witnesses.[19] (See Evid. Code, §780(f).)

Separately, in articulating that Yagman possesses moral integrity, many witnesses

conflated this concept with Yagman's drive to do civil rights work or his legal skills. But, fitness

to practice encompasses both skill and ethical behavior. Indeed, Yagman was a very skilled

attorney when he engaged in the bankruptcy and tax fraud crimes and presumably skilled when

he was disciplined in the State Bar Court in 1997.[20]

---

[18] Many of these letters were originally offered as support letters at Yagman's federal
sentencing hearing in 2007, with approximately 14 of them accompanied by October 2020
declarations affirming their respective opinions remain steadfast. Separately, at least ten
individuals submitted declarations attesting to their opinion as to Yagman's conduct and good
moral character since his sentencing, including three judges and four attorneys.

[19] Irrespective of this finding, the court found Marion's testimony credible in describing
Yagman's paralegal help from 2010 through 2017. (See Findings, 2(E), *supra*.)

[20] See *Yagman, supra,* 3 Cal. State Bar Ct. Rptr. at p. 788.

Nonetheless, the sentiments echoed by witnesses in the legal community—Yagman is remorseful for his past wrongdoings; he has the present legal acuity to competently practice law; he is dedicated to civil rights; and Yagman has not engaged in any observed unethical behavior—all support Yagman's return to practice. This includes the testimony of the judges, mentioned above, and those who submitted letters, Hon. Jill Jakes (Los Angeles Municipal Court Judge, ret.), Hon. Dean D. Pregerson, and Hon. John Robert Takasugi (whose father, the late Hon. Robert Takasugi, was also friends with Yagman). The court gives careful consideration to these opinions, especially in light of their close observation of Yagman over the years. (See *Preston v. State Bar* (1946) 28 Cal.2d 643, 651 [members of the bar and bench are morally bound by their oaths to not recommend reinstatement for those who have not rehabilitated].)

This careful consideration leads the court to conclude there has been a showing of substantial evidence of good character, rejecting OCTC's urging that little weight should be given due to the witnesses' lack of awareness of the detailed facts underlying the conviction. While it is concerning that *some* of the declarants articulated their *personal* belief that Yagman was set-up, or a target of the government, for his good work in civil rights litigation—the declarants did not attribute the sentiment as originating from Yagman and nonetheless, they described him to be a person of good moral character and honest in their dealings with him. (See *Preston, supra,* 28 Cal.2d at p. 651 [character evidence entitled to consideration where "irrespective of the beliefs of [the] witnesses as to petitioner's guilt, they believe her now to be a good person of good moral character on the basis of her exemplary conduct since her disbarment"].)

And, each of the live witnesses demonstrated at least a general understanding of the nature of Yagman's misconduct and testified credibly to his genuine remorse and their conviction that Yagman is morally fit and his misconduct was out of character for him. So, this

-17-

court draws a distinction between the varying quality and persuasiveness of the character

evidence and looks to the cumulative effect—mindful of the fact that "[i]n reaching a fair

conclusion on the question of reformation…the favorable testimony of acquaintances, neighbors,

friends, associates and employers with reference to their observation of the daily conduct and

mode of living of an attorney who has suffered disbarment should weigh heavily in the scale of

justice." (*In re Andreani* (1939) 14 Cal.2d 736, 749.)

In sum, this court gives substantial weight to the observations of the six judges as

bolstered by the observations of Tiffany, Professor Olsen, and six additional present-day

declarations attesting to Yagman's current moral fitness and rehabilitation.[21]

### B.  Yagman credibly expressed remorse and demonstrated honesty to this court.

Yagman expressed remorse to this court during these proceedings, and to those in the

legal community following his conviction, demonstrating some evidence of present moral

fitness. Indeed, the character witnesses universally described Yagman as being humbled by the

experience of the conviction and sentence, and his disbarment thereafter. In describing the

change in his personality, witnesses described Yagman as "chastened," "no longer arrogant," or

the "absence of bravado." Many described Yagman's worry that his misconduct and conviction

would lead to the alienation of affection, shame by association.

In his own words, Yagman testified that he erred in allowing himself to believe in his

own "b.s." Yagman had used his own skills as an advocate to convince himself that his

bankruptcy filings and actions were okay, but now has the insight to see his behavior as "stupid"

and done out of self-interest or "greed." To avoid future misconduct, Yagman stated that he

would rely on those around him as a sounding board—even if he disagreed with their advice.

---

[21] This court does not rely on the observations of Marion and Reichmann nor those
contained in the various letters from 2007, respectively, due to the concerns over credibility and
lack of relevance to Yagman's present moral fitness. (Evid. Code, §§ 210, 312, 780.)

Yagman acknowledged that aggressiveness may have its purpose in litigation but does not

necessarily serve one well as a human being. Acknowledging his age of 75 at the time of

testimony, Yagman considers himself more reflective and cautious in his decision-making in

present day.

Yagman also accepted responsibility for his misconduct resulting in his disbarment and

that in his prior disciplinary matters.[22] Regarding his first disciplinary matter, Yagman

acknowledged that he acted improperly and was overzealous, thinking more of the cause rather

than the client in pressuring the client to reject the settlement offer; and that this behavior was

oppressive. Regarding the second matter, Yagman acknowledged that he again acted improperly

and in the interest of greed with respect to his handling of his client fee agreements; that it was

inconsistent with someone with good character, not high-minded. So, with respect to all matters,

Yagman admitted his own fault, acknowledged the harm he caused, and described himself to

now be more insightful and self-reflective.[23]

Apart from his appearance of sincerity, Yagman's honesty was demonstrated in two

specific instances during these proceedings. One, Yagman disclosed the circumstances of his

return to custody from the halfway house and of the alleged violation of supervision. (See

---

[22] In case Nos. 81-O-10242, 81-O-10272, and 82-O-10965, effective February 24, 1989,
Yagman received a six-month suspension, the most serious charge being that Yagman sought an
unconscionable fee by insisting that his contingency fee be measured on a default judgment
against a foreign defendant when the client wished to accept a lesser offer in settlement of the
judgment against Yagman's recommendation. (*Yagman, supra,* 3 Cal. State Bar Ct. Rptr. at p.
806.)

In case Nos. 91-O-03890, 93-O-19984, 92-O-20254, and 93-O-18769, effective October
16, 1998, Yagman received a one year suspension for failure to communicate a written
settlement offer, failure to promptly pay out client funds, failure to render an appropriate
accounting, commingling, misappropriation, entering into an illegal fee agreement, and engaging
in moral turpitude in the collection of an unconscionable fee. (*Id.* at p. 792.)

[23] Though without detail, Yagman testified that he wanted to better understand himself,
so sought the help of a psychologist of whom he consulted by telephone.

Findings, 2(B), *supra.*) This narrative was not given as a direct answer to a question presented by OCTC, nor did OCTC present any evidence of this return to custody. And second, after Yagman's counsel delivered his closing remarks, Yagman filed on November 20, 2020, "Petitioner's Motion No. 3" (see Procedural History, *supra*) which included as paragraph 8 of Yagman's declaration: "I also correct a factual error in Mr. Beaber's closing argument . . . that I authored a civil rights 'hornbook.' I did not do that. What I did was write two federal, civil rights instructions treaties, which are listed on pages 7-8 . . . Exhibit 1001." These two examples demonstrate Yagman's candor to this court.

On this record, this court finds Yagman's expression of remorse to be genuine and deserving of substantial consideration. (See *In the Matter of Respondent O* (Review Dept. 1993) 2 Cal. State Bar Ct. Rptr. 581, 588 [hearing judge to assess credibility under all relevant factors including Evidence Code sections 780 and 312].)

**Discussion**

Having now determined the facts as established on this record, the court below considers the law and standard of proof, in recommending that Yagman be reinstated to the practice of law.

**1.  Petitioner bears the burden of showing rehabilitation from acts of moral turpitude.**

A petitioner seeking reinstatement has the heavy burden of establishing by clear and convincing evidence that he has been rehabilitated and has the present moral qualifications for admission. (*Feinstein, supra,* 39 Cal.2d at p. 546.) This burden of showing good moral character is substantially more rigorous for an attorney seeking reinstatement than for a first-time applicant. (*Menna, supra*, 11 Cal.4th at p. 986.)

Rehabilitation is a process. There is always a beginning, but proof of its achievement, illusory—as there can be no guarantee of no further misconduct. (See *Tardiff v. State Bar* (1980) 27 Cal.3d 395, 404, citing *Resner v. State Bar* (1967) 67 Cal.2d 799, 811.) So, the court looks to

whether the record supports evidence of a sustained period of rehabilitation in assurance of reform. (See *In the Matter of Giddens* (Review Dept. 1990) 1 Cal. State Bar Ct. Rptr. 25, 37; *Feinstein*, *supra*, 39 Cal.2d at p. 547.) Indeed, evidence of good character and reputation—no matter how laudatory—is not enough on its own. (*Menna, supra*, 11 Cal.4th at p. 988; *In the Matter of Ainsworth* (Review Dept. 1998) 3 Cal. State Bar Ct. Rptr. 894, 901.) Nor does an expression of remorse by petitioner, alone, demonstrate rehabilitation. (*In the Matter of Oheb* (Review Dept. 2006) 4 Cal. State Bar Ct. Rptr. 920, 939.) Rather, proof of rehabilitation must include a lengthy period of unblemished, exemplary conduct. (*Menna, supra*, 11 Cal.4th at p. 989.)

Though the law favors the regeneration of erring attorneys (*Brown*, *supra*, 2 Cal. State Bar Ct. Rptr. at p. 315), this court must be mindful of the depth of misconduct committed by Yagman. The court is tasked to determine whether Yagman's efforts at post-conviction rehabilitation overcomes his acts of moral turpitude—honesty is absolutely fundamental in the practice of law and without that pillar "the profession is worse than valueless in the place it holds in the administration of justice." (*Menna*, *supra*, 11 Cal.4th at p. 989.)

In assessing the independent requirements of rehabilitation and present fitness, the court is to consider the petitioner's character in light of the moral shortcomings which resulted in the imposition of discipline. (*Roth v. State Bar* (1953) 40 Cal.2d 307, 313.) The more serious the misconduct, the stronger the showing required. (See *Tardiff*, *supra*, 27 Cal.3d at p. 403.) So, the amount of evidence required for reinstatement varies according to the seriousness of the misconduct at issue. (*In the Matter of Rudman* (Review Dept. 1993) 2 Cal. State Bar Ct. Rptr. 546, 552-553.)

### A. Yagman has engaged in volunteerism for over 10 years, free from misconduct.

Whether this court measures Yagman's rehabilitation period starting from his

incarceration period which began in 2008, after his release in 2010, or after his supervised

release ended in November 2012, (see *Gossage*, *supra*, at p. 1099 [court considered time after

end of parole]), there is a sufficient distance from the conviction for the court to consider

whether Yagman has rehabilitated from his misconduct. (See *Werner v. State Bar* (1954) 42

Cal.2d 187, 198 [conc. opn. of J. Carter.] [*dicta*, seven-year period sufficient to determine

whether one has rehabilitated]; *Kwasnik v. State Bar* (1990) 50 Cal.3d 1061, 1071-1072

[emphasizing seven or eight-year period that elapsed since applicant wrongfully evaded payment

of a civil judgment].)

As demonstrated by action, while incarcerated, Yagman taught inmates the fundamentals

of the law and helped bridge access to the courts; and after his release, Yagman returned to

teaching at UCLA on a volunteer basis, picking up from where he left off in 2008. He continues

to consult in civil rights matters with other attorneys and has even brought citizen actions under

FOIA in *pro per*, one of which is ongoing.

Importantly, in Yagman's many years of work since his conviction, no evidence of

proven misconduct has arisen. Indeed, in Judge Paez's observations over the course of 26 years,

he has not witnessed any dishonesty or unethical behavior during Yagman's litigation in district

court or in the Ninth Circuit. In Judge Paez's opinion, Yagman is honest and forthright and

conducts himself with integrity. Though Judge Paez did not recall all the matters in which

Yagman appeared, Yagman followed up with his own testimony that he appeared as recently as

December 2016 before Judge Paez in *Yagman v. Pompeo*, a FOIA matter.[24]

---

[24] This court takes judicial notice that *Yagman v. Pompeo* (9th Cir. 2017) 868 F.3d 1075,
was argued in December of 2016, and the opinion filed on August 27, 2017. (Evid. Code,
§§451(a), 452(a).)

Finally, in making amends for his criminal behavior, Yagman paid restitution to all creditors. The court also notes that Yagman's special conditions on release from prison included demonstrating financial responsibility and honesty; and OCTC had not presented any evidence of a violation of these terms.

**B. Yagman has demonstrated present moral fitness.**

Apart from these good acts, Yagman testified that he has reformed—corroborated by his character witnesses who opined that Yagman is morally fit to return to the practice of law.

Though reformation is a state of mind which "may be difficult to establish affirmatively" and "may not be disclosed by any certain or unmistakable outward sign" (*Andreani, supra,* 14 Cal.2d at p. 749), whether a petitioner has accepted responsibility is a relevant consideration. (See *Rudman*, *supra*, 2 Cal. State Bar Ct. Rptr. at p. 558 [rehabilitation found where attorney expressed remorse and shame]; contra, *Ainsworth, supra.* 3 Cal. State Bar Ct. Rptr. at p. 899 [continuing failure to appreciate gravity of the misconduct].)

Here, Yagman stressed during his testimony that he is now 75 years old, that he has evolved as a person, that his thinking has changed. He acknowledged that he was properly found culpable of misconduct in his prior disciplinary proceedings and that, once his federal conviction was final, he accepted that his summary disbarment was appropriate. (See e.g., *In the Matter of Salant* (Review Dept. 1999) 4 Cal. State Bar Ct. Rptr. 1, 19-20 [no adverse moral conclusions can be made from seeking judicial remedies from the court].)

The court disagrees with OCTC's argument that the words chosen by Yagman in describing his remorse reflect a deficiency. Principally, OCTC argues that Yagman's assertion that his convictions were not *in* the practice of law and his use of the words "one tiny quibble" regarding his post-conviction litigation of the bankruptcy fraud show a misunderstanding of the seriousness of his misconduct. But this is the parsing of words. First, it is true that his

-23-

convictions were not in the practice of law, but regardless, Yagman never claimed that made them any less serious. Separately, Yagman also testified that "[he] was stupid," by filing the bankruptcy petition when he was in serious financial trouble owing to spending more money than he was making. He candidly said he was acting "greedily" and used his skills as an advocate to convince himself that his misconduct was okay at that time.

Indeed, there are no talismanic words to demonstrate an appreciation for one's mistake nor is there misconduct in seeking judicial remedy post-conviction. Succinctly put by the Court in *Calaway*, "deeds speak louder than self-serving protestations." (*Calaway v. State Bar* (1986) 41 Cal.3d 743, 748 citing *Feinstein, supra,* 39 Cal.2d at p. 555 [dis. opn. of J. Carter].) Based on this court's observations of Yagman and hearing his own words, in addition to his actions post-release supporting sincere remorse, the court is satisfied that Yagman has shown that he is personally committed to discharging his fiduciary responsibilities ethically.

## 2. No adverse evidence was presented to lower the persuasiveness of petitioner's evidence.

OCTC takes the position that Yagman has not met his heavy burden to prevail. Though not presenting any evidence of misconduct, OCTC argues that adverse inferences can be drawn from the evidence Yagman presented.

While it is true that OCTC "need not rebut a Petitioner's showing of rehabilitation, [and] present moral fitness . . . with clear and convincing adverse evidence to prevail," OCTC did not "proffer sufficient evidence to lower the persuasiveness of the petitioner's evidence so that he does not meet his burden to prove his case by clear and convincing evidence." (*Ainsworth, supra,* 3 Cal. State Bar Ct. Rptr. at p. 899, citing *In the Matter of Kirwan* (Review Dept. 1997) 3 Cal. State Bar Ct. Rptr. 630, 636.)

The court looks to *Kirwan* (*supra*, 3 Cal. State Bar Ct. Rptr. at p. 636), where the Review Department found through the petitioner's own testimony that the attorney was unfit to practice,

-24-

in that he engaged in the unlawful practice of law by giving out legal advice in a casino project

and made the questionable decision to associate with a felon who was prohibited from owning an

interest in their joint adventure. (*Id.* at pp. 636-638.)

Unlike *Kirwan*, OCTC here did not impeach Yagman's evidence of reform in any

substantial manner. As addressed in the court's findings, Yagman's assistance to inmates did not

rise to unlawful practice of law. And Yagman's continued participation as a concerned citizen

allows him the right to bring FOIA actions. Finally, Yagman is allowed to provide assistance to

lawyers who are aware of his disbarred status—of which both Marion and Tiffany were so

informed. Indeed, it would be quizzical to require a petitioner to demonstrate present ability and

learning while denying one the opportunity to stay abreast of the law.

In sum, OCTC's arguments are unpersuasive in challenging the strength of Yagman's

evidence. Nonetheless, the remaining question posed is whether that evidence rises to clear and

convincing to support readmission.

## 3. Yagman's evidence is sufficient in comparison of illustrative cases recommending reinstatement.

Whether Yagman's evidence of rehabilitation and present fitness rise to clear and

convincing evidence[25] in support of reinstatement in light of the misconduct, this court is

directed to compare the facts here to those in published reinstatement matters. (*Brown*, *supra*, 2

Cal. State Bar Ct. Rptr. at p. 320.)

In *Brown*, fifteen years had elapsed since the misconduct, which consisted of two

convictions, conspiring to obstruct justice and falsifying documents and public records, as a

result of two separate schemes over a three-year period, both of which involved the manipulation

---

[25] Clear and convincing evidence leaves no substantial doubt and is sufficiently strong to command unhesitating assent of every reasonable mind. (*In the Matter of Jensen* (Review Dept. 2013) 5 Cal. State Bar Ct. Rptr. 283, 288, citing *Conservatorship of Wendland* (2001) 26 Cal.4th 519, 552.)

of charges in criminal driving under the influence matters. Brown was incarcerated for nine

months and remained on probation until three years prior to filing his petition for reinstatement.

In consideration of his years of good behavior, extensive *pro bono* work (one day a week

spanning four years for a legal services program), recognition of his misconduct, remorse, and

fundamental change of values (presenting testimony of a psychologist), as well as the testimony

of his seven character witnesses (including judges and lawyers), the court granted Brown's

reinstatement. (*Brown*, *supra*, at pp. 319-320.)

This court also looks to *Miller*, where the attorney misappropriated funds from a probate

estate over the course of six years and purchased art and traveled using stolen funds; but

thereafter recognized the gravity of his misconduct as demonstrated by repaying restitution with

interest and committed himself to *pro bono* research as a paralegal. Miller further demonstrated

the ability to exercise fiduciary responsibilities appropriately in handling a probate estate.

(*Miller*, *supra*, 2 Cal. State Bar Ct. Rptr at p. 437.)

Like Yagman's crimes, both *Brown* and *Miller* involved multiple acts of misconduct over

many years, both involved serious acts of dishonesty, and *Miller* involved monetary profiting.

Yet, the misconduct was not so egregious that rehabilitation was beyond reach.

Here, Yagman forthrightly stated to this court that he did not know what more he could

do to demonstrate remorse and rehabilitation—apart from doing what he has done and his

expressed remorse. In comparison of the good deeds shown in *Brown* and *Miller*, this court

agrees that Yagman has satisfied his burden. (Contra, *Rudnick, supra*, 5 Cal. State Bar Ct. Rptr.

at p. 27 [lack of effort to identify all victims to satisfy restitution]; *Ainsworth*, *supra*, 3 Cal. State

Bar Ct. Rptr. at p. 894 [petitioner mischaracterized his misconduct as mistakes, thereby failing to

show rehabilitation]; *Giddens*, *supra*, 1 Cal. State Bar Ct. Rptr. at p. 25 [omissions and

incomplete information on reinstatement petition].)

### Recommendation

After consideration of the facts and the law, the court concludes that Stephen Yagman's reinstatement to the practice of law is warranted. Along with satisfying the other requirements, Yagman has proven by clear and convincing evidence the requisite good moral character for reinstatement, comprising "overwhelming[] proof of reform. . . which we could with confidence lay before the world in justification of a judgment again installing him in the profession.[] [Citation]." (*In re Menna, supra,* 11 Cal.4th at p. 989.)

It is recommended that the petition for reinstatement be **GRANTED** and that petitioner **Stephen Yagman** be reinstated to the practice of law in California upon payment of all applicable fees and costs.

Dated:  January 29, 2021

PHONG WANG
Judge of the State Bar Court

-27-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 3

.

**Re: Calif. Bar Approves Plan To Expunge Nondisbarment Records**

Attorney Discipline Defense Counsel <ADDC@HOME.EASE.LSOFT.COM>
on behalf of
David Carr <dccarr@ETHICS-LAWYER.COM>
Wed 8/21/2024 11:22 AM
To:ADDC@HOME.EASE.LSOFT.COM <ADDC@HOME.EASE.LSOFT.COM>

That is part of the proposals now out for public comment.

# Proposed New State Bar Policy Regarding the Removal of Nondisbarment Discipline, Administrative Suspensions, and Inactive Enrollments







**The State Bar seeks public comment on a proposed new State Bar policy that would remove from the publicly available attorney profile page nondisbarment discipline, administrative suspensions, and inactive enrollments.**
**Deadline: September 24, 2024, 11:59 p.m.**
**Direct comments to**
Comments should be submitted using the online Public Comment Form. The online form allows you to input your comments directly.
**Background**
The Board established the Ad Hoc Commission on the Discipline System in November 2020 to assess reforms implemented by the State Bar to further the efficiency, effectiveness, and fairness of the discipline system and to identify any additional improvements needed. On September 22, 2022, the Board received the commission's final report and recommendations. See Agenda Item 701.
At its January 2023 meeting, after consideration of the Ad Hoc Commission's recommendations, in addition to other directives, among others, the Board directed staff to:

1. Propose timelines for the removal of discipline from attorney profile pages on the State Bar website that are consistent with the practices of California regulatory agencies and other state attorney licensing agencies that currently have policies in place for both the display and removal of discipline histories from their respective websites, and
2. Develop a timeline and procedure for removing administrative inactive enrollments from attorney profiles on the State Bar website.

The proposed policy was developed in response to those directives.
**Discussion/proposal**

Staff proposes a new State Bar policy to remove nondisbarment public discipline and administrative suspensions from the licensee's attorney profile page. Website removal means the removal of nondisbarment discipline and administrative suspensions from the licensee's attorney profile page. Removal of nondisbarment public discipline and administrative suspensions from the attorney profile page would not constitute expungement and the information would still be available upon request.

The criteria for website removal are on the policy in <u>Attachment B</u>.

## Any fiscal/personnel impact

Adoption of the policy would require an information technology investment to develop a solution to automate the removal of discipline history and administrative suspensions and administrative inactive enrollments from the attorney profile page. In the short term, significant manual work would be required to provide the relief granted by these proposals. Additionally, there may be ongoing costs associated with receipt and processing of requests for records that remain public but have been removed from the attorney profile page. The impact of these costs would depend on the volume of requests received.

## Background material

- From the Board of the Trustees Meeting July 18, 2024: <u>Staff Report Item 5.1</u>, Proposed Amendments to Rules 9.8 and 9.31 of the Rules of Court and Proposed New Rule 9.33 Relating to Expungement of Attorney Discipline and Administrative Actions: Request to Circulate for Public Comment
- <u>Attachment B to Staff Report Item 5.1</u>

## Source

State Bar Staff

## Deadline

September 24, 2024, 11:59 p.m.

## Direct comments to

Comments should be submitted using the <u>online Public Comment Form</u>. The online form allows you to input your comments directly.

**David C. Carr**
**Ethics Lawyer**
**Professional Corporation**
1645 West Valencia Road 109-273
Tucson AZ 85746
(619) 696-0526
<u>dccarr@ethics-lawyer.com</u>
<u>www.ethics-lawyer.com</u>
*Licensed to Practice in California, Texas and New Mexico*
This email message contains information that may be confidential and privileged. Unless you are the addressee (or authorized to receive messages for the addressee), you may not use, copy, or disclose this message (or any information contained in it) to anyone. If you have received this message in error, please advise the sender by reply email and delete this message.
Nothing in this message should be interpreted as a digital or electronic signature that can be used to authenticate a contract or other legal document.
Thank you.

**From:** Attorney Discipline Defense Counsel <ADDC@HOME.EASE.LSOFT.COM> **On Behalf Of** Megan Zavieh
**Sent:** Wednesday, August 21, 2024 10:57 AM
**To:** ADDC@HOME.EASE.LSOFT.COM
**Subject:** Re: Calif. Bar Approves Plan To Expunge Nondisbarment Records

Is there a way an administrative suspension such as failure to complete CTAPP can be removed? Either currently or under pending rules?

**From:** Attorney Discipline Defense Counsel <ADDC@HOME.EASE.LSOFT.COM> **On Behalf Of** Carol M Langford
**Sent:** Wednesday, May 22, 2024 8:49 PM
**To:** ADDC@HOME.EASE.LSOFT.COM
**Subject:** Re: Calif. Bar Approves Plan To Expunge Nondisbarment Records

It is in the DJ today Jean.
Sent from my iPhone

> On May 22, 2024, at 5:39 PM, Jean Cha <jean@chalawethics.com> wrote:

> Awesome. Do you have more information about this? Thank you!

> Jean Cha
> Office (714) 242-8588
> Direct Dial (323) 877-2832
> jean@chalawethics.com

> Confidentiality Notice: Do not read this e-mail if you are not the intended recipient. If you have received this transmission in error, please destroy the original transmission and its attachments without reading or saving them in any matter and contact (714) 242-8588.  Thank you.

> **From:** Attorney Discipline Defense Counsel <ADDC@HOME.EASE.LSOFT.COM> **On Behalf Of** Edward Lear
> **Sent:** Tuesday, May 21, 2024 9:30 PM
> **To:** ADDC@HOME.EASE.LSOFT.COM
> **Subject:** Calif. Bar Approves Plan To Expunge Nondisbarment Records

> ## Calif. Bar Approves Plan To Expunge Nondisbarment Records

> ### By Lynn LaRowe

> The State Bar of California approved a plan to automatically expunge records of attorney disciplinary actions after eight years, so long as there was no disbarment and the lawyer stayed out of trouble — a move designed to bring greater fairness to the state's attorney disciplinary system.

> Ed Lear
> Sent from my iPad

---

To unsubscribe from the ADDC list, click the following link:
http://home.ease.lsoft.com/scripts/wa-HOME.exe?SUBED1=ADDC&A=1

To unsubscribe from the ADDC list, click the following link:
http://home.ease.lsoft.com/scripts/wa-HOME.exe?SUBED1=ADDC&A=1

To unsubscribe from the ADDC list, click the following link:
http://home.ease.lsoft.com/scripts/wa-HOME.exe?SUBED1=ADDC&A=1

Access the ADDC Home Page and Archives

Unsubscribe from the ADDC List

Access the ADDC Home Page and Archives

Unsubscribe from the ADDC List

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 4

Case 2:22-cv-08010-DOC-KES   Document 95   Filed 09/06/24   Page 48 of 55   Page ID
#:808
Case 2:22-cv-08010-DOC-KES   Document 88   Filed 08/21/24   Page 16 of 27   Page ID
#:706

1
2                    **DECLARATION OF JOSEPH REICHMANN**
3          I, JOSEPH REICHMANN, declare the following to be true under the
4     penalty of perjury at Venice Beach, California, pursuant to 28 U.S.C. § 1746, on
5     the date set forth below my signature hereinbelow.
6          1. I am a principal of the law firm of Yagman + Reichmann, LLP, that was
7     formed in July 2021, and before that was a principal in Yagman & Reichmann,
8     P.C., from Nov. 2, 1999 to July 2021, and I am one of the attorneys for the
9     plaintiff in this action. Our firm website accurately sets forth my legal
10    qualifications: I have practiced law for 65 years, and from 1980 to 1996 was a
11    Magistrate Judge of this court.
12         2. Yagman + Reichmann, LLP maintains a website at yagmanlaw.net: it is
13    *not,* as defense counsel states, "Mr. Yagman's website." Opp. at 19-20. I was
14    surprised to learn that my address with the California Bar is not the office address,
15    and that is because after I retired from the federal bench in 1996, I neglected to
16    change my address with the Bar.
17         2. I regularly work with Stephen Yagman, mostly consulting with him about
18    strategies and doing appeals. He often does first drafts of appellate briefs, which I
19    then review and submit. I have co-counseled with Stephen and Marion R. Yagman
20    in both state and federal trials and have co-counseled with him on appeals. The
21    reason that I joined Stephen's law firm in 1999 was that I thought that he was the
22    best civil rights lawyer in Los Angeles. Stephen always has been and is ready to
23    defend the defenseless, as are the plaintiffs in this action. All of my work with
24    Yagman + Reichmann, LLP always has been done *pro bono publico.*
25         3. I am ready, willing, and able to prosecute or to defend any appeals in this
26    action, or any other action in which the firm might be involved.
27         4. I was the plaintiffs' appellate counsel in *Finley v. Garcetti,* 2:21-cv-
28    06003-DOC(KESx) and I decided to dismiss that appeal by not filing an opening

                                           1

Case 2:22-cv-08010-DOC-KES    Document 95    Filed 09/06/24    Page 49 of 55    Page ID
                                    #:809
Case 2:22-cv-08010-DOC-KES    Document 88    Filed 08/21/24    Page 17 of 27    Page ID
                                    #:707

1
2  brief because I believed that there was little chance of prevailing. I did not "fail" to
3  file an opening brief, as defense counsel contends, but instead chose the best way
4  to terminate that appeal was to do nothing, so that the court simply would dismiss
5  the appeal, which is what happened.

6
7
8  _____
9  JOSEPH REICHMANN  08/20/24
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2

Case 2:22-cv-08010-DOC-KES   Document 95   Filed 09/06/24   Page 50 of 55   Page ID
Case 2:22-cv-08010-DOC-KES   Document 80   Filed 08/21/24   Page 21 of 27   Page ID
#:711

Yagman + Reichmann, LLP (https://yagmanlaw.net/)

ABOUT US

# WHO WE ARE

We are federal civil rights lawyers, who also handle other types of civil cases, habeas corpus, and criminal law matters.

We protect the rights of those abused by police brutality, excessive force and unlawful searches and seizures, and people in prisons.

Potential clients may find the application here (http://yagmanlaw.net/application.html).

### 50 YEARS!
Still . . . after all these years.

"Stephen Yagman has entered a field of law that's difficult. He is always the underdog, and he is facing the establishment at its fiercest. So, anyone who gets into that arena is brave and has a mission."

United States District Judge Stephen V. Wilson (2007).

"Stephen Yagman has been known for creating issues, tension, and using his position as an attorney to wreak havoc on many [police officers' and government officials'] lives . . . ."

Los Angeles City Attorney's Office (2022).

Case 2:22-cv-08010-DOC-KES    Document 95    Filed 09/06/24    Page 51 of 55   Page ID
Case 2:22-cv-08010-DOC-KES    Document 88-1  Filed 08/21/24    Page 22 of 27   Page ID
#:811
#:712

Yagman + Reichmann, LLP (https://yagmanlaw.net/)

# Joe Reichmann

BAR ADMISSIONS:

Admitted to bars: California; U.S. Supreme Court; U.S. Court of Appeals for the Ninth Circuit; U.S. District Court for the Central District of California.

EDUCATION:

UCLA School of Law: J.D., 1959.
University of California at Los Angeles: B.S. business administration, accounting major, 1953

REPRESENTATIVE AREAS OF PRACTICE:

Mr. Reichmann has had extensive experience in the area of criminal law, including serving as a deputy district attorney in Los Angeles County, California, from 1960 to 1970. Mr. Reichmann was appointed to the Federal Indigent Defense Panel in 1970 and, for the 10 year period from 1970 to 1980, Mr. Reichmann practiced criminal defense. From 1970 to 1980, Mr. Reichmann was exclusively engaged in the practice of criminal law both in the California State courts and in the United States District Court for the Central District of California. Mr. Reichmann has extensive appellate experience, representing criminal defendants both in the California State appellate court system and before the Ninth Circuit Court of Appeals, and, during that 10 year period, filed at least 50 appeals on behalf of criminal defendants. On occasion, Mr. Reichmann's appellate experience has included the filing of petitions for writs of certiorari to the United States Supreme Court.

Case 2:22-cv-08010-DOC-KES   Document 95   Filed 09/06/24   Page 52 of 55   Page ID
Case 2:22-cv-08010-DOC-KES   Document 88-12   Filed 08/21/24   Page 23 of 27   Page ID
#:713

From 1980 to 1996, Mr. Reichmann was a highly respected United States Magistrate Judge for

ichmann's extensive

(https://yagmanlaw.net/)

d court trials of section

nmendations in habeas

corpus cases. During his tenure as Magistrate Judge, Mr. Reichmann also conducted numerous
settlement conferences in Section 1983 cases, as well as in a vast array of complex tort and class
action cases.

In 1999 Mr. Reichmann joined the law firm of Yagman & Yagman & Reichmann, to which he has
brought his invaluable experience as a former Magistrate Judge, as a seasoned criminal attorney,
and in federal civil rights.

TEACHING EXPERIENCE:

1997-1998: Adjunct Professor, University of West Los Angeles School of Law:
taught class on 42 U.S.C. § 1983 and Bivens civil rights law.

YAGMAN + REICHMANN, LLP

(310) 452-3200

Case 2:22-cv-08010-DOC-KES   Document 95   Filed 09/06/24   Page 53 of 55   Page ID
#:813
Case 2:22-cv-08010-DOC-KES   Document 88   Filed 08/21/24   Page 18 of 27   Page ID
#:708



(/)

*APPLY (/ADMISSIONS)*     *GIVE (HTTPS://GIVING.U*



# Frances Elisabeth Olsen

*Professor of Law*

## Contact

> Faculty & Research (/faculty) >

Faculty Profiles (/faculty/faculty-profiles) > Frances Elisabeth Olsen

UCLA
School of
Law
385
Charles
E. Young
Dr. East
Los
Angeles,

*B.A. Goddard
College, 1968*

*J.D. University of
Colorado, 1971*

*S.J.D. Harvard, 1984*

*UCLA Faculty
Since 1984*

Case 2:22-cv-08010-DOC-KES    Document 95    Filed 09/06/24    Page 54 of 55    Page ID
Case 2:22-cv-08010-DOC-KES    Document 88    Filed 08/21/24    Page 19 of 27    Page ID
#:814

CA,
90095

✉ olsen@la
w.ucla.ed
u
(mailto:ol
sen@law
.ucla.edu
)

Frances Olsen teaches *Feminist Legal Theory, Dissidence &
Law, Family Law,* and *Torts.* Her areas of research interest in-
clude legal theory, social change and feminism.

During law school, Professor Olsen did legal aid work for mi-
grant farm workers in Colorado and was the notes & com-
ments editor of the *University of Colorado Law Review.* She
then clerked for the chief judge of the U.S. District Court in
Colorado. She represented Native Americans at Wounded
Knee in 1973. She established the first feminist public inter-
est law firm in Denver, and, from 1981 to 1983 while an
S.J.D. student, founded a legal academic women's group, the
Fem-Crits, which spread across the country. She has taught
courses in feminist legal theory at Harvard, Oxford,
Cambridge, Berlin, Frankfurt, Tokyo, Jerusalem, and at other
universities in the U.S., France, Italy, Japan, and Israel. She
was a fellow at Oxford University in 1987 and holds a Life
Fellowship at Churchill College, Cambridge University. She
has lectured throughout the world.

Professor Olsen has edited *Feminist Legal Theory I:
Foundations and Outlooks* and *II: Positioning Feminist
Theory Within the Law* (1995). In addition to writing some
100 articles published world-wide, including in the *Harvard
Law Review* and *Yale Law Journal,* she co-authored *Cases
and Materials on Family Law: Legal Concepts and Changing
Human Relationships* (with Weyrauch and Katz, 1994).

Case 2:22-cv-08010-DOC-KES    Document 95    Filed 09/06/24    Page 55 of 55    Page ID
#:815
Case 2:22-cv-08010-DOC-KES    Document 88    Filed 08/21/24    Page 20 of 27    Page ID

# Bibliography

+ **BOOKS**

+ **ARTICLES AND CHAPTERS**

+ **OTHER**

# Courses Available

**LAW 376**

Law and Dissent

$\rightarrow$

**LAW 613**

The Criminal (In)Justice System

$\rightarrow$

**LAW 655**

**LAW 312**